UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| RICARDO RAMIREZ, | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | NO. 4:14-CV-40054-TSH |
| | ) | |
| THE CITY OF WORCESTER, | ) | |
| WORCESTER CITY MANAGER | ) | |
| MICHAEL V. O'BRIEN, WORCESTER | ) | |
| CHIEF OF POLICE GARY J. GEMME, | ) | |
| DETECTIVE LARRY T. WILLIAMS, and | ) | |
| DETECTIVE DANA RANDALL, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER ON DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT (Docket No. 47)**

**May 11, 2017**

**HILLMAN, D.J.**

Plaintiff Ricardo Ramirez filed the present action after he sustained injuries including a fractured jaw and broken teeth during his arrest by defendants Worcester Police Detectives Larry Williams and Dana Randall. Ramirez alleges violations of 42 U.S.C. § 1983 (Count I), False Arrest (Count III), Malicious Prosecution (Count IV), Civil Conspiracy (Count V), Assault and Battery (Count VI), violations of the Massachusetts Civil Rights Act, Mass. Gen. L. ch. 112 (Count VII), and Intentional Infliction of Emotional Distress (Count VIII) against Williams and Randall, as well as violations of 42 U.S.C. § 1983 (*Monell* claims) against the City of Worcester, Worcester City Manager Michael V. O'Brien, and Worcester Chief of Police Gary Gemme (Count II). Defendants City of Worcester, O'Brien, Gemme, and Detectives Williams and Randall jointly

1

move for partial summary judgment of Counts II, III, and V. For the reasons outlined below, the motion for summary judgment is ***granted in part and denied in part***.

## Background

On the morning of July 19, 2011, plaintiff Ricardo Ramirez was approached by Worcester Vice Squad Detectives Larry Williams and Dana Randall on Murray Avenue in Worcester, MA. Williams and Randall had been surveilling the area, known for drug dealing, from an unmarked Worcester Police vehicle in the parking lot of Compare Foods, near the Murray Avenue Apartments. The officers noticed a Hispanic male driving a vehicle while talking on a cell phone and looking furtively, apparently searching for someone. The car pulled in and parked in the Compare Foods parking lot, and the driver, later identified as Angel Aponte, continued scanning the area, apparently looking for someone.

Shortly thereafter, Williams and Randall saw Ramirez exit 50 Murray Ave., pick up his phone, and cross Murray Street into the parking lot of Compare Foods, also apparently searching for someone. Aponte and Ramirez noticed each other and waved, and Ramirez climbed into the passenger seat of the vehicle. In his Police Report, Randall alleges that he saw Aponte hand something to Ramirez, and believed that Ramirez took something from his pocket and handed it to Aponte. Aponte and Ramirez then drove out of the parking lot, and took a left turn into the YMCA parking lot, approximately 200 yards away. Ramirez got out of the car and began walking back toward 50 Murray Ave. Randall believed that he had seen an illegal narcotics exchange, and radioed two fellow Worcester police officers in the area to pursue Aponte in the vehicle, while he and Detective Williams made contact with Ramirez. Detectives Williams and Randall were both wearing plain clothes, not police uniforms, when they approached Ramirez.

The parties dispute the events that transpired when Williams and Randall confronted Ramirez. According to Randall's police report, both detectives clearly displayed their badges and identified themselves as Worcester Police while walking toward Ramirez, and asked to speak with him. Randall's report claims that Ramirez immediately took an "aggressive fighting stance," hit Detective Williams in the collar bone area, then attempted to flee. Docket No. 49-1, p. 5. Randall's police report then alleges that Ramirez pulled his arm back to strike again, and that Randall loudly announced "Worcester Police, your [sic] under arrest!" *Id.* Randall claims he delivered two strikes to Ramirez's "center region" to stop the attack and create distance, but that Ramirez continued to fight violently. *Id.* Randall's police report states that both detectives then attempted a "standing arm bar take down," Ramirez lost his footing, and fell to the ground, where he "continued to fight violently hitting his mouth on the sidewalk." *Id.* Once on the sidewalk, Ramirez was handcuffed. A search of his person turned up an empty plastic container, cell phone, and $60.

Detective Williams did not file his police report of the incident until April 29, 2014, about two-years and eight months after the arrest occurred, and after this lawsuit was filed. Williams claims in his report that he had his badge displayed on his chest when he and Randall approached Ramirez, and that Williams announced "Police," and reached for Ramirez's arm "to prevent the destruction of any evidence…or an attempt to flee our stop," because "[s]uspects routinely flee or resist us…." Docket No. 49-1, p.6. Williams' Report states that Ramirez pulled away and became combative, "raising and swinging his fists to strike me somewhere in the upper body," and that Williams "swung back at Ramirez striking him in the face once." *Id.* Williams' Report claims that Ramirez continued to fight and resist as they "yelled for him to stop, attempting to control his arms next to a fence then [] forced him to the ground." *Id.* Williams' Report further states that the detectives struggled to control Ramirez on the ground, and he was eventually handcuffed.

3

For his part, Ramirez admits getting into the car with Aponte, but claims that Aponte only wanted Ramirez to accompany him to the Registry of Motor Vehicles to serve as a translator. When Ramirez refused, Aponte pulled over and dropped him off at the YMCA, one block away, and he began walking back to 50 Murray Ave. Ramirez alleges Williams and Randall were on the staircase of a nearby building dressed in shorts and T-shirts, and one of the two was wearing a grey bandana on his head. As Ramirez was passing, he alleges Williams grabbed him by his right tricep, and said "[y]o stop, something like that." Docket No. 50-1, ¶16. Ramirez alleges that his first instinct was that the men were planning to mug him, as he was in a "high crime area." *Id.* at ¶16. Ramirez pulled his arm away, said "[w]hat the f---," and then immediately felt a blow to the right side of his face, followed by a blow to the left side of his face. *Id.* at ¶18-19. He denies ever hitting Randall or Williams.

Ramirez claims neither detective had a badge visible at the time, and that they did not identify themselves as police until after he had been struck twice in the face. Ramirez alleges he told the officers that he didn't know they were police, and thought he was being mugged. He claimed one of the detectives "helped him come down to the ground." *Id.* at ¶22. Ramirez claims that his face did touch the ground, but "it wasn't that I hit myself or anything." *Id.* at ¶24. He claims the officers then searched his pockets and found an empty canister that he used for vitamins and heartburn medication. Ramirez denied any wrongdoing and told Williams and Randall that they had not identified themselves as police. It was at that point, according to Ramirez, that Williams removed a police badge from under his shirt.

Other Worcester police detectives had arrested Aponte, searched his vehicle, and recovered Suboxone tablets. Suboxone contains bupenorphrine and naloxone. Bupenorphrine is a Class III controlled substance. Ramirez alleges that Randall asked Ramirez to take responsibility for the

4

drugs recovered in Aponte's vehicle, or he would be charged with assault on a police officer and resisting arrest. Ramirez denied any wrongdoing, told the officers he was injured, and requested an ambulance. Ramirez had visible injuries, was bleeding from his mouth, and says that he showed the officers that his teeth had been broken, but they did nothing.

Both officers testified in their depositions that they did not notice that Ramirez was injured. Randall testified that he did not see Williams strike Ramirez in the face, and was surprised that Williams had stated he had done so. Williams testified that he did not see Randall strike Ramirez, and did not know how or why Ramirez broke his jaw and teeth.

Ramirez suffered a broken jaw and broken teeth, had to have his jaw wired, and underwent two surgeries, including insertion of metal plate to repair the damage. He continues to suffer pain and difficulty eating as a result of his injuries.

### **Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that the Court shall grant summary judgment if the moving party shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute precludes summary judgment if it is both "genuine" and "material." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). For a fact to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (citation omitted). A fact is "material" when it might affect the outcome of the suit under the applicable law. *Id*.

5

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing v. Outback Steakhouse of Florida*, LLC, 575 F.3d 145, 153 (1st Cir. 2009). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact within the record. *Id.* at 152. "The test is whether, as to each essential element, there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (quoting *DeNovellis*, 124 F.3d at 306) (citation omitted). A trial judge acts well within his authority on a summary judgment motion in assessing the reasonableness of the inferences that might be drawn from the circumstantial evidence. *Ricci v. Alternative Energy, Inc.*, 211 F.3d 157 (1st Cir. 2000).

### Discussion

*Count II - 42 U.S.C. § 1983, Supervisory and Monell Liability, against the City of Worcester, O'Brien, and Gemme*

Defendants argue that summary judgment should be entered in their favor with regards to Count II because Ramirez has failed to meet his burden in establishing the existence of a policy or custom of failing to exercise discipline and control over, *inter alia*, the use of force. The Court does not find that it would be beneficial or efficient to undertake analysis of the supervisory and *Monell* claims against the City, Chief Gemme and City Manager O'Brien at this stage. The Court granted Defendants' motion to bifurcate the trial on August 30, 2016. The Section 1983 claims against Officers Randall and Williams will be tried first. If the jury finds that Randall and/or Williams committed a constitutional violation, the Court will schedule a separate trial on the supervisory and *Monell* claims. Prior to such trial, the Court will likely permit the parties to file dispositive motions on such claims.

*Count III – False Arrest against Randall and Williams*

Defendants contend Ramirez's claim of false arrest fails as a matter of law because it collaterally attacks state court proceedings, and is thus barred by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). The Plaintiff does not oppose the Defendants' motion for summary judgment on Count III, accordingly, summary judgment with respect to Count III against Williams and Randall is granted.

*Count V – Civil Conspiracy against Randall and Williams*

Defendants seek summary judgment in their favor with regards to the Plaintiff's claim of civil conspiracy against Randall and Williams on the basis that Ramirez has not provided evidence sufficient to support the existence of a conspiracy. To succeed on his claim for civil conspiracy, Ramirez must prove "a combination of two or more persons act[ed] in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'" *Santiago v. Fenton*, 891 F.2d 373, 389 (1st Cir. 1989) (quoting *Hampton v. Hanfahan*, 600 F.2d 600, 620-21 (7th Cir. 1979), *rev'd in part on other grounds*, 446 U.S. 774 (1979) (quoting *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir.1973)). While evidence of express agreement is not necessary to prove conspiracy, there must be sufficient circumstantial evidence for a reasonable jury to find the existence of a civil rights conspiracy "without speculation and conjecture." *Earle v. Benoit*, 850 F.2d 836, 845 (1st Cir. 1988) (quoting *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir.1986)).

Ramirez argues that the record contains sufficient evidence to permit a reasonable inference that Randall and Williams conspired to use excessive force against him, or otherwise violate his civil rights. While there is no evidence on the record of any express agreement between the officers to violate Ramirez's civil rights, there is adequate circumstantial evidence to infer such a conspiracy.

Ramirez testified at his deposition that Williams and Randall failed to properly identify themselves as police officers prior to initiating physical contact with him. Taking this fact alone, a reasonable factfinder might conclude that the failure of either officer to adequately identify themselves set in motion an almost inevitable chain of events under which an unidentified officer lays hands on the suspect, the suspect resists, and one or both officers then proceed to violently subdue the suspect, and charge him with resisting arrest and assaulting a police officer. Williams' own admission that suspects routinely flee their stops adds context that a reasonable factfinder might weigh in determining whether Randall and Williams had, by explicit or implicit agreement, adopted a practice of physically subduing a suspect *prior* to identifying themselves as police officers. Additionally, a reasonable fact finder might, in weighing the credibility of the officers' versions of the event, consider the consistency of their accounts, the timing of the completion of written reports of the incident, and whether or not the officers' observations were sufficient and complete with respect to the injuries that the plaintiff appears to have sustained.

Whether or not Randall and Williams properly identified themselves to Ramirez prior to subduing him, and if they didn't, their motivation for not doing so, are factual disputes that are material to the conspiracy count and thus should be left to a jury. Because the Court finds that the record before it could permit a reasonable factfinder to infer a conspiracy to violate Ramirez's civil rights, the Defendant's motion for summary judgment as to Count V is denied.

## Conclusion

Defendants' motion for summary judgment as to Count III is **_granted_**. Defendants' motion for summary judgment as to Count V is **_denied_**. Summary judgment on Count II is also **_denied_**, as the Court bifurcated the trial of the supervisory and *Monell* claims against the City, Chief Gemme and City Manager O'Brien, and will conduct the trial of Williams and Randall first. If a jury finds Williams and/or Randall committed a constitutional violation, the Court will schedule a separate trial on the supervisory and *Monell* claims. Prior to such trial, the Court will likely permit the parties to file dispositive motions on such claims.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**